**LeClairRyan, A Professional Corporation**
Todd M. Galante (TG-5532)
Jason C. DiBattista (JD-2859)
One Riverfront Plaza, Sixteenth Floor
1037 Raymond Boulevard
Newark, New Jersey 07102
Telephone:  (973) 491-3600
Facsimile:  (973) 491-3555

*Counsel for Capital One, N.A.,*
*A Secured Creditor and Party-In-Interest*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

------------------------------------------------------------ x

| | : | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| ADMIRAL WINE AND LIQUOR CO., | : | |
| | : | Case No. 10-45213 (RG) |
| Debtor. | : | |
| | : | |
| | : | |
| | : | |

------------------------------------------------------------ x

**OBJECTION OF CAPITAL ONE, N.A. TO DEBTOR'S VERIFIED MOTION**
**FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 361, 363 AND 364 AND**
**FED. R. BANKR. P. 4001 (I) AUTHORIZING THE DEBTOR TO**
**OBTAIN POST-PETITION FINANCING AND GRANT SECURITY INTERESTS**
**AND LIENS TO AN INSIDER, (II) AUTHORIZING THE DEBTOR TO USE CASH**
**COLLATERAL AND PROVIDE ADEQUATE PROTECTION, (III) SCHEDULING AN**
**INTERIM AND FINAL HEARING, AND (IV) GRANTING RELATED RELIEF,**
**AND EMERGENCY CROSS-MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§**
**105(a), 1112(b) AND 305(a), AND FED. R. BANKR. P. 1017(a) (I) DISMISSING**
**CHAPTER 11 CASE, OR (II) IN THE ALTERNATIVE, FOR ABSTENTION**

Capital One, N.A. (the "Bank"), a secured creditor and party-in-interest in the above-captioned Chapter 11 case of Admiral Wine and Liquor Co. (the "Debtor"), the debtor and debtor-in-possession herein, by and through its undersigned counsel, hereby submits this objection (the "Objection") to the Debtor's Verified Motion for an Order Pursuant to 11 U.S.C.

§§ 361, 363 and 364 and Fed. R. Bankr. P. 4001 (I) Authorizing the Debtor to Obtain Post-Petition Financing and Grant Security Interests and Liens to an Insider, (II) Authorizing the Debtor to Use Cash Collateral and Provide Adequate Protection, (III) Scheduling an Interim and Final Hearing, and (IV) Granting Related Relief (the "DIP Financing Motion").  In addition, the Bank hereby cross-moves this Court on an emergency basis for the entry of an order pursuant to 11 U.S.C. §§ 105(a), 1112(b) and 305(a) and Fed. R. Bankr. P. 1017(a) (I) dismissing the Debtor's Chapter 11 case or, (II) in the alternative, for abstention (the "Cross-Motion").  In support of the Objection and the Cross-Motion, the Bank respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      For the reasons stated herein, the Interim DIP Order should not be entered and the proposed DIP Financing should not be authorized.  The proposed DIP Financing is simply not permitted pursuant to the provisions of the Second OSC/TRO (as defined below).  Specifically, Michael Zeiger, one of the principals of the Debtor, and his wife Rochelle Zeiger (collectively, the "Zeigers"), are currently restrained and enjoined from dissipating or transferring their assets pending further order of the Superior Court of New Jersey, Chancery Division.  Notwithstanding same, Michael Zeiger has proposed to provide the Debtor (*i.e.*, himself in his corporate capacity) with a $500,000 collateralized debtor-in-possession loan – clearly a non-ordinary course transaction – presumably using his own cash.  This attempt by Michael Zeiger to utilize his assets to fund the Debtor's post-petition estate is a direct violation of the state court order and cannot be authorized by this Court.  Putting that issue aside, any DIP financing negotiated by and among the same person, by its terms, cannot be at arms' length or in good faith.  Michael Zeiger is an "insider" of the Debtor, as that term is defined in the Bankruptcy Code.  Simply put, the proposed DIP financing is prohibited by a state court order and, in any event, was not negotiated

in good faith or at arms' length.

2.    Furthermore, the adequate protection proposed by the Debtor and its affiliate CRL Properties, LLC (a non-debtor) ("CRL") to protect the Bank's Cash Collateral is both inadequate and, in the case of the CRL Property Second Lien (as defined below), is expressly prohibited by the Second OSC/TRO, as set forth below.  Therefore, any attempt by the Debtor to provide the Bank with adequate protection of its interest in the Cash Collateral in the form of the CRL Property Second Lien is, in a word, futile.  Moreover, given the Debtor's systematic inability to produce reliable financial records or valuation data in connection with the Chapter 11 case, any offered replacement lien as adequate protection is insufficient.  In fact, the Debtor has even failed to list the correct amount of its debt to the Bank in its "first day" pleadings.  Specifically, the Debtor states in its motions that its debt to Bank is only $2.7 million, <u>when in fact the aggregate amount of the debt is in excess of $4.3 million</u> (including certain guaranty obligations).  Therefore, the proposed use of the Bank's Cash Collateral is inappropriate, and in fact prohibited by order of the New Jersey state court, and therefore should not be approved.

3.    Finally, as discussed at length in the Cross-Motion, this Debtor has no business in Chapter 11 in the first place.[1]  The Debtor's revenues have plummeted in recent times, and it has suffered from mismanagement and severe operational challenges, with no foreseeable turnaround in view.  The Debtor has not provided any information whatsoever about its plans in Chapter 11, despite filing numerous "first day" pleadings.  There are is no indication as to the Debtor's business plan, possibility of sale, potential recoveries for the estate's creditors, or how the Debtor intends to re-finance or pay off its debt to the Bank.  The reason for this lack of information is simple:  <u>The Debtor has no plan whatsoever</u> and is using the Chapter 11 process to frustrate the

---

[1]    The Debtor has had approximately two years to address its obligations to the Bank.  Indeed, the Debtor knew that its obligations to the Bank were going to mature in June of 2009.  For at least six months before that date through the present time, the Debtor has not been able to arrange payment of its debts to the Bank.

Bank's numerous and costly attempts to foreclose on its Collateral – a process which the Debtor has admitted on numerous occasions that it has no defense.

4.      The right result here for the Bank as well as all of the Debtor's creditors is for the Chapter 11 case to be immediately dismissed and the Bank to be permitted to foreclose on its Collateral and exercise its other remedies.  Permitting the Debtor to remain in Chapter 11 will do nothing but give the Debtor a free ticket to further dissipate the Collateral and continue to run the company into the ground to the detriment of all creditors.  In the alternative, the Court should abstain from proceeding with the Chapter 11 case.

## JURISDICTION

5.      The Court has jurisdiction to consider the DIP Financing Motion, this Objection and the Cross-Motion under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of these cases in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the Objection is as set forth in the DIP Financing Motion.  The statutory predicates for the Cross-Motion are sections 105(a), 1112(b) and 305(a) of Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code")

## FACTUAL BACKGROUND

A.      **The Pre-Petition Relationship Between the Bank, the Debtor, the Zeigers and CRL**

        *(a)      The $2,700,000 Admiral Loan and the Debtor's Default Thereon*

6.      The Bank and the Debtor entered into a Loan Agreement dated July 29, 2008, pursuant to which the Bank agreed to make available to the Debtor a line of credit of up to $2,500,000.00 (the "Admiral Loan"), upon the terms and conditions set forth in the Loan Agreement (the "Loan Agreement").  See the Certification of Kenneth Geiger (the "Geiger

Certification"), filed contemporaneously herewith in support of the Objection and the Cross-Motion, at ¶ 2. A copy of the Loan Agreement is attached as Exhibit A to Geiger Certification.

7.      In order to more fully evidence the Admiral Loan, and in exchange for consideration received, the Debtor executed and delivered to the Bank a business-purpose promissory note dated July 29, 2008, pursuant to which the Debtor promised to pay to the Bank pursuant to the terms of the promissory note the principal sum of $2,500,000.00, or so much thereof as borrowed by the Debtor under the Loan Agreement, together with interest thereon at a floating rate set annually at one quarter of one percent (0.25%) below the Bank's Prime Rate, as defined therein, calculated on a 360-day year, with all unpaid principal, interest, and other charges due in full on June 30, 2009 (the "Admiral Note"; collectively, the Admiral Note, the Loan Agreement and the remaining of loan documents discussed herein are the "Admiral Loan Documents"). *Id.* at ¶ 3. A copy of the Admiral Note is attached to the Geiger Certification as Exhibit B.

8.      Pursuant to the terms of the Admiral Loan Documents, the Debtor agreed that any failure to pay the Bank when due the indebtedness under the Admiral Loan Documents for a period of ten days would be an event of default under the Admiral Loan Documents. *Id.* at ¶ 4.

9.      Pursuant to the terms of the Admiral Loan Documents, the Debtor agreed to pay a late charge on any sums which are paid ten (10) days or more after they become due, equal to four percent (4.0%) of the payment due. *Id.* at ¶ 5.

10.      Pursuant to the terms of the Admiral Loan Documents, the Debtor also agreed that if it defaulted on the Admiral Loan Documents, the interest rates applicable to the unpaid principal, interest, late fees, attorneys' fees and other charges due would be increased by five percent (5.0%). *Id.* at ¶ 6.

11.     Pursuant to the terms of the Admiral Loan Documents, the Debtor also agreed that it would pay the Bank's reasonable attorneys' fees and legal expenses in connection with collection of the indebtedness due under the Admiral Loan Documents or the enforcement of the Bank's rights with respect to the security for the Admiral Loan Documents. *Id.* at ¶ 7.

12.     Pursuant to the Admiral Loan Documents, the Debtor further agreed that it would provide to the Bank within 60 days after June 30 and December 31 of each calendar year, management-prepared semi-annual financial statements of the Debtor (including, without limitation, a balance sheet, statements of income and retained earnings and cash flows) as of the last day of and for such semi-annual period then elapsed, all in reasonable detail and certified by the Debtor's chief financial officer to be accurate and to have been prepared from the books and records of the Debtor. Failure to provide the financial statements is an event of default under the Admiral Loan Documents. *Id.* at ¶ 8.

13.     Pursuant to the Admiral Loan Documents, the Debtor further agreed that it would provide to the Bank within 60 days after June 30 and December 31 of each calendar year, an aging report of all of the Debtor's accounts receivable and accounts payable existing as of the last day of and for such semi-annual period, in form and substance satisfactory to the Bank in its sole discretion and certified as accurate by the chief financial officer of the Debtor. Failure to provide the aging accounts receivables report is an event of default under the Admiral Loan Documents. *Id.* at ¶ 9.

14.     Within the Loan Agreement, the Debtor agreed that it would be required to meet certain financial covenants on an ongoing basis, and that its failure to meet these covenants would be an event of default. *Id.* at ¶ 10.

15.     The Debtor further entered and delivered to the Bank a Security Agreement dated

July 29, 2008 (the "July Security Agreement"), pursuant to which the Debtor granted, *inter alia*, to the Bank a first position Uniform Commercial Code Security Interest and lien in the following collateral:

> All of the Debtor's right, title and interest in and to:
>
> (a) All machinery, furniture, fixtures, equipment and other personal property of the Debtor, now existing and hereafter acquired;
>
> (b) All work in process, materials and inventory of the Debtor, now existing and hereafter acquired;
>
> (c) All accounts, claims for monies due and other accounts receivable of the Debtor, now existing and hereafter arising;
>
> (d) All general intangibles of the Debtor, now existing and hereafter arising;
>
> (e) All documents, instruments, investment property and chattel paper of the Debtor, now existing and hereafter acquired; and
>
> (f) All other property and assets of the Debtor, now existing and hereafter acquired.

*Id.* at ¶ 11. A copy of the July Security Agreement is attached to the Geiger Certification as Exhibit C.

16. In order to more fully evidence the Bank's first position security interest granted under the July Security Agreement, the Debtor executed and delivered to the Bank UCC-1 Financing Statements evidencing the first position lien, which UCC-1's were duly filed in the office of the New Jersey Department of the Treasury on August 19, 2008, as document number 24912020, and recorded in the office of the Clerk of Essex County on August 25, 2008, as instrument number 8078575, covering the following collateral:

> All of the Debtor's right, title and interest in and to:

(a)    All machinery, furniture, fixtures, equipment and other personal property of the Debtor, now existing and hereafter acquired;

(b)    All work in process, materials and inventory of the Debtor, now existing and hereafter acquired;

(c)    All accounts, claims for monies due and other accounts receivable of the Debtor, now existing and hereafter arising;

(d)    All general intangibles of the Debtor, now existing and hereafter arising;

(e)    All documents, instruments, investment property and chattel paper of the Debtor, now existing and hereafter acquired; and

(f)    All other property and assets of the Debtor, now existing and hereafter acquired.

*Id.* at ¶ 12.

17.    The Debtor further entered and delivered to the Bank a Security Agreement dated September 10, 2008 (the "September Security Agreement"), pursuant to which the Debtor granted, *inter alia*, to the Bank a Uniform Commercial Code Security Interest and lien in the following collateral, in first position to the extent not covered by the July Security Interest:

All personal property now owned or hereafter acquired by the Debtor including but not limited to all goods, consumer goods, farm products, inventory, equipment, furniture, money, instruments, accounts, accounts receivable, contract rights, documents, chattel paper and general intangibles, all of which collectively is the "Collateral".

All products of Collateral and all additions and accessions to, replacements of, insurance or condemnation proceeds of, and documents covering Collateral, all property received wholly or partly in trade or exchange for Collateral, all leases of Collateral and all rents, revenues, issues, profits and proceeds arising from the sale, lease, encumbrance, collection, or any other temporary or permanent disposition, of the Collateral or any interest therein.

*Id.* at ¶ 13.  A copy of the September Security Agreement is attached to the Geiger Certification as Exhibit D (hereinafter, the collateral as defined in the July Security Agreement and/or the September Security Agreement is the "Collateral").

18.     By agreement dated March 27, 2009, the total principal amount available to the Debtor under the Admiral Loan, the Admiral Note and the Admiral Loan Documents was increased to $2,700,000.00.  All other terms of the Admiral Note, the Admiral Loan and the Admiral Loan Documents remained unchanged, including the maturity date of June 30, 2009.[2] *Id.* at ¶ 14.

19.     The Debtor failed to make payment of the Admiral Note on June 30, 2009.  CRL, together with the Debtor and the Zeigers, executed and delivered to the Bank a Forbearance Agreement dated August 29, 2009, in which they admitted, *inter alia*, that the Debtor was in default of the Admiral Note and the Admiral Loan Documents, and the Bank agreed that it would forbear from exercising its rights due to such default until September 30, 2009, and the Debtor, CRL and the Zeigers agreed that on or before September 30, 2009, the full principal balance of $2,700,000, plus all accrued and outstanding interest would be paid in full (the "August Forbearance Agreement").  *Id.* at ¶ 15.  A copy of the August Forbearance Agreement is attached to the Geiger Certification as Exhibit E.

20.     The Debtor, CRL and the Zeigers, further agreed and admitted in the August Forbearance Agreement that:

> The Obligated Parties, by its execution of this Agreement, hereby declares that it has no set-offs, counterclaims, defenses or other causes of action against the Bank arising out of the Obligations or

---

[2]     As set forth in more detail in Paragraphs 26 through 43 herein, the Debtor also executed and delivered to the Bank an absolute guaranty of the debt of CRL to the Bank.  CRL's debt to the Bank is also in default, and the Bank is owed in excess of $1.9 million on the CRL debt.  The aggregate amounts due to the Bank by the Debtor thus exceed $4.3 million (well in excess of the $2.7 million debt listed in the Debtor's various "first day" pleadings.)

> the Guaranties, this Agreement, or otherwise, as of the execution
> date hereof, and to the extent any such set-offs, counterclaims,
> defenses or other causes of action may exist, whether known or
> unknown, as of the execution date hereof, such times are hereby
> waived by Borrower.

*Id.* at ¶ 16; *See also* August Forbearance Agreement, ¶ 7(a).

21.    The Debtor, CRL and the Zeigers also gave releases to the Bank as part of the

August Forbearance Agreement.  *Id.* at ¶ 17; *See also* August Forbearance Agreement, ¶ 7(b).

22.    The Debtor failed to make payment of the sums due under the Admiral Loan

Documents on or before September 30, 2009.  Thereafter, the Debtor, CRL, the Zeigers and the

Bank entered into a Modification and Extension Agreement dated November 25, 2009, pursuant

to which, *inter alia*, (i) the maturity date on the Admiral Note was extended to February 28,

2010, (ii) the regular, non-default interest rate on the Admiral Note was changed to the Bank's

Prime rate plus three percent (3.0%), (iii) the Debtor, CRL, and the Zeigers admitted that the

principal amount due under the Admiral Note was $2,700,000, and (iv) the Debtor, CRL and the

Zeigers again confirmed that they had no defenses to enforcement of the Admiral Note, as well

as gave releases to the Bank:

> The Obligated Parties, by its execution of this Agreement, hereby
> declares that it has no set-offs, counterclaims, defenses or other
> causes of action against the Bank arising out of the Obligations or
> the Guaranties, this Agreement, or otherwise, as of the execution
> date hereof, and to the extent any such set-offs, counterclaims,
> defenses or other causes of action may exist, whether known or
> unknown, as of the execution date hereof, such times are hereby
> waived by Borrower.

*Id.* at ¶ 18; *See also* Modification and Extension Agreement, ¶ 8(a) and (b).  A copy of the

Modification and Extension Agreement is attached to the Geiger Certification as Exhibit F.

23.    The Debtor failed to make payment of the sums due under the Admiral Note and

the Admiral Loan Documents on February 28, 2010.  CRL, together with the Debtor and the

Zeigers, executed and delivered to the Bank a second Forbearance Agreement dated March 26,

2010, in which they admitted, *inter alia*, the Debtor was in default of the Admiral Note, and the

Bank agreed that it would forbear from exercising its rights due to such default until May 31,

2010, and the Debtor, CRL and the Zeigers agreed that on or before May 31, 2010, the full

principal balance of $2,700,000, plus all accrued and outstanding interest would be paid.  The

Debtor, CRL and the Zeigers further agreed that the interest rate on the principal outstanding

under the Admiral Note would be the Bank's Prime rate plus four percent (4%) (the "March

Forbearance Agreement").  *Id.* at ¶ 19.  A copy of the March Forbearance Agreement is attached

to the Geiger Certification as Exhibit G.

24.    The Debtor, CRL and the Zeigers further agreed and confirmed that:

> The Obligated Parties, by its execution of this Agreement, hereby
> declares that it has no set-offs, counterclaims, defenses or other
> causes of action against the Bank arising out of the Obligations or
> the Guaranties, this Agreement, or otherwise, as of the execution
> date hereof, and to the extent any such set-offs, counterclaims,
> defenses or other causes of action may exist, whether known or
> unknown, as of the execution date hereof, such times are hereby
> waived by Borrower.

> In consideration of the Bank's forbearance of legal action(s) as
> herein provided, and other benefits received and acknowledged the
> Obligated Parties, do hereby RELEASE, RELINQUISH, and
> forever DISCHARGE the Bank, and the Bank's successors
> assigns, agents, officers, directors, employees, counsel and legal
> representatives, of and from any and all claims, demands, actions
> and causes of action, of any and every kind or character, whether
> known or unknown, which Obligated Parties may have against the
> Bank, and its predecessors in interest, successors, assigns, agents,
> officers, directors, employees, counsel, and representatives, as of
> the execution date hereof, arising out of or with respect to any and
> all transactions relating to this Agreement, the Obligations, the
> Guaranties, or any other loan documents.

> By execution of this Agreement the Obligated Parties hereby
> release the Bank, its successors and assigns as well as the Bank's
> subsidiaries, affiliates, officers, directors, agents, employees,

> servants, attorneys, representatives as well as the respective heirs, personal representatives, successors and assigns and any all of them from any and all claims the Obligated Parties may have against the Bank in connection with the Note, the Other Notes and the CRL Note and the related proceedings and this Agreement.

*Id.* at ¶ 20; *See also* March Forbearance Agreement, ¶ 9(a) – (c).

25.    The Debtor failed to make payment on the Admiral Note on or before May 31, 2010, and its time to make such payment has not been further extended.  Accordingly, after numerous forbearances and extensions granted by the Bank, prior to and through the Petition Date, the Debtor has been in default under the Admiral Note and the Admiral Loan Documents for, among other things, failure to make timely payment upon the maturity of the Admiral Loan. *Id.* at ¶ 21.

### (b)    The $2,300,000 CRL Loan, the Debtor's Guaranty Thereof, and the Defaults Thereon

26.    In exchange for consideration received, non-debtor affiliate CRL executed and delivered to the Bank a business-purpose promissory note dated August 9, 2005, pursuant to which CRL promised to pay to the Bank pursuant to the terms of the promissory note (as well as the terms of other loan documents) the principal sum of $2,300,000.00 (the "CRL Note").  *Id.* at ¶ 22.  A copy of the CRL Note is attached to the Geiger Certification as Exhibit H.

27.    The New Jersey Economic Development Authority ("EDA") is a participant in the loan, having loaned the sum of $500,000.00 (the "EDA Principal"), and the Bank having loaned the sum of $1,800,000.00 (the "Bank Principal").  Pursuant to the terms of the CRL Note, each portion of the participation in the CRL Note accrued interest at a different interest rate.  *Id.* at ¶ 23.

28.    The EDA Principal accrues interest at the initial rate of five and seven hundredths percent (5.07%) per annum, calculated on a 360-day year, adjusting at the beginning of the sixth

year of the loan to one percent (1.00%) over the then current five year United States Treasury Note yield, but in no case less than four percent (4.00%) per annum, with initial payments of $3,319.14 per month beginning on October 1, 2005, and adjusting when the interest rate adjusts on August 9, 2011, with all EDA Principal, interest and other fees and charges due in full on September 15, 2015.  *Id.* at ¶ 24.

29.    The Bank Principal accrues interest at the rate of five and eighty-two hundredths percent (5.82%) per annum, calculated on a 360-day year, with payments of $12,795.98, due on the first of each month, beginning on October 1, 2005, and with all Bank Principal, interest and other fees and charges due in full on September 15, 2015.  *Id.* at ¶ 25.

30.    Pursuant to the terms of the CRL Note, CRL agreed that any failure to pay the Bank when due the indebtedness under the CRL Note for a period of ten days would be an event of default under the CRL Note.  *Id.* at ¶ 26.

31.    Pursuant to the terms of the CRL Note, CRL agreed to pay a late charge on any sums which are paid ten (10) days or more after they become due, equal to four percent (4.0%) of the payment due.  *Id.* at ¶ 27.

32.    Pursuant to the terms of the CRL Note, CRL also agreed that if it defaulted on the CRL Note, the interest rates applicable to the unpaid Bank Principal and EDA principal would be increased by five percent (5.0%).  *Id.* at ¶ 28.

33.    Pursuant to the terms of the CRL Note, CRL also agreed that it would pay the Bank's reasonable attorneys' fees and legal expenses in connection with collection of the indebtedness due under the CRL Note or the enforcement of the Bank's rights with respect to the security for the CRL Note.  *Id.* at ¶ 29.

34.    Pursuant to the terms of the CRL Note, CRL agreed that if it, the Debtor or the

Zeigers defaulted on any other obligations of any of them to the Bank, then the CRL Note would

be in default.  *Id.* at ¶ 30.

35.    As set forth above, the Debtor, CRL and the Zeigers have failed and refused to

pay the sums due under the Admiral Note and the Admiral Loan Documents, and accordingly the

CRL Note was in default prior to and through the Petition Date, and continues to be in default.

The CRL Note is also otherwise in default.  *Id.* at ¶ 31.

36.    Within the August Forbearance Agreement, CRL, the Debtor and the Zeigers

admitted, *inter alia*, that the CRL Note was in default, and affirmed that they have no defenses to

enforcement of the CRL Note, and provided releases to the Bank:

> The Obligated Parties, by its execution of this Agreement, hereby
> declares that it has no set-offs, counterclaims, defenses or other
> causes of action against the Bank arising out of the Obligations or
> the Guaranties, this Agreement, or otherwise, as of the execution
> date hereof, and to the extent any such set-offs, counterclaims,
> defenses or other causes of action may exist, whether known or
> unknown, as of the execution date hereof, such times are hereby
> waived by Borrower.

*Id.* at ¶ 32;  *See also* August Forbearance Agreement, ¶ 7(a).

37.    Within the March Forbearance Agreement, CRL, together with the Debtor and the

Zeigers, admitted, *inter alia*, that the CRL Note was in default, and affirmed that they have no

defenses to enforcement of the CRL Note, and provided releases to the Bank:

> The Obligated Parties, by its execution of this Agreement, hereby
> declares that it has no set-offs, counterclaims, defenses or other
> causes of action against the Bank arising out of the Obligations or
> the Guaranties, this Agreement, or otherwise, as of the execution
> date hereof, and to the extent any such set-offs, counterclaims,
> defenses or other causes of action may exist, whether known or
> unknown, as of the execution date hereof, such times are hereby
> waived by Borrower.

*Id.* at ¶ 33; *See also* March Forbearance Agreement, ¶ 9(a) – (c).

38.    In order to more fully secure the sums which might become due under the CRL

Note, among other things, CRL executed and delivered to the Bank a Mortgage and Security

Agreement dated August 9, 2005, securing against real property owned by CRL located at 74

Sand Park Road, Cedar Grove, New Jersey (the "CRL Property") (which is the location where

the Debtor operates) the principal amount of $2,300,000.00 advanced under the CRL Note, plus

interest and other charges which might become due thereunder, which mortgage was recorded in

the Essex County Recorder's Office on September 9, 2005 at Book 10720, Page 36 et. seq. (the

"CRL Mortgage").  *Id.* at ¶ 34.

39.    There is presently due on the CRL Note the principal balance of $1,930,885.10,

plus (as to CRL only) interest accruing at the default rate set forth in the CRL Note, late charges,

attorneys' fees, other costs and expenses due under the Admiral Loan Documents, and costs of

suit.  *Id.* at ¶ 35.

40.    In order to more fully secure the repayment of the sums due from CRL to the

Bank, the Debtor executed and delivered to the Bank an "Agreement of Guaranty", dated August

9, 2005 (the "Admiral Guaranty"), pursuant to which the Debtor agreed to guaranty to the Bank

the payment of all sums due to the Bank (or EDA) under the CRL Note or otherwise in

connection with the loan, including principal, interest, late fees, attorneys' fees, and other costs

and charges.  *Id.* at ¶ 36.  A copy of the Admiral Guaranty is attached to the Geiger Certification

as Exhibit I.

41.    In addition, in order to more fully secure the repayment of the sums due from

CRL to the Bank, the Zeigers executed and delivered to the Bank an "Agreement of Guaranty,"

dated August 9, 2005 (the "Zeiger Guaranty"), pursuant to which the Zeigers agreed to, among

other things, jointly and severally guaranty to the Bank the payment of all sums due to the Bank

(or EDA) under the CRL Note or otherwise in connection with the loan, including principal, interest, late fees, attorneys' fees, and other costs and charges. *Id.* at ¶ 37. A copy of the Zeiger Guaranty is attached to the Geiger Certification as Exhibit J.

42. Despite demand, prior to the Petition Date, the Debtor and the Zeigers failed and refused to pay the sums due to the Bank from CRL, and remain in default of their obligations under their respective Agreements of Guaranty, despite being given every opportunity by the Bank to cure the debt or come up with an alternative solution. *Id.* at ¶ 38.

43. Combining the defaulted Admiral Note with the defaulted Admiral Guaranty, the Debtor owes the Bank in excess of $4.3 million.[3] *Id.* at ¶ 39.

**B.    The Pre-Petition State Court Action Against the Debtor, the Zeigers and CRL**

44. Since the original maturity date of the Admiral Note, the Debtor has employed three different law firms and three different turnaround professionals while attempting to wright its sinking ship in some fashion. As evidenced by the numerous forbearances and extensions given to the Debtor by the Bank, the Bank has worked tirelessly with the Debtor to find a reasonable solution to the issues outlined above – while in fact it could have simply elected to enforce its rights in its Collateral rather than work with the Debtor. In fact, over the Summer of 2010, the Bank offered a third forbearance opportunity to the Debtor, which the Debtor abandoned and refused to sign and deliver to the Bank. *Id.* at ¶ 40.

45. As a result of the numerous defaults, broken promises, delays and failures to perform by the Debtor, CRL and the Zeigers outlined above, on or about October 22, 2010, the Bank commenced an action in the Superior Court of New Jersey, Chancery Division, Essex County (the "State Court"), by filing a Verified Complaint (the "State Court Complaint"), other

---

[3]    Notably, there is no mention of the debt owed to the Bank on account of the Admiral Guaranty in any of the pleadings filed by the Debtor to date, nor in Debtor's Chapter 11 petition.

supporting documentation, and a proposed Order to Show Cause with Temporary Restraints, in the action styled *Capital One, N.A., as successor by merger to North Forth Bank vs. Admiral Wine & Liquor Company, CRL Properties LLC, Michael Zeiger and Rochelle Zeiger*, Docket No. L-8608-10 (the "State Court Action"). *Id.* at ¶ 41. A copy of the State Court Complaint (without Exhibits) is attached to the Geiger Certification as Exhibit K.

46.    On October 22, 2010, the State Court conducted a conference with the parties to consider entry of the proposed Order to Show Cause with Temporary Restraints. *Id.* at ¶ 42.

47.    Following that conference, upon full consent of all parties including the Bank, the Debtor, CRL and the Zeigers, the State Court entered that certain Order to Show Cause with Temporary Restraints (the "First OSC/TRO") on October 22, 2010 and scheduled a hearing for further relief on Friday, November 5, 2010, which was ultimately adjourned to November 12, 2010 at 1:30 p.m. A copy of the First OSC/TRO is attached to the Geiger Certification as Exhibit L. *Id.* at ¶ 43.

48.    Pursuant to the First OSC/TRO, the Debtor was required to appear before the State Court on November 5, 2010 to show cause why the Court should not enter an order of replevin and/or an order for immediate repossession and sale of collateral for the following collateral held by Admiral:

    (a)    All machinery, furniture, fixtures, equipment and other personal property of Admiral, now existing and hereafter acquired;

    (b)    All work in process, materials and inventory of Admiral, now existing and hereafter acquired;

    (c)    All accounts, claims for monies due and other accounts receivable of Admiral, now existing and hereafter arising;

    (d)    All general intangibles of Admiral, now existing and hereafter arising;

     (e)     All documents, instruments, investment property and chattel paper of Admiral, now existing and hereafter acquired;

     (f)     All other property and assets of Admiral, now existing and hereafter acquired;

     (g)     all goods, consumer goods, farm products, contract rights, documents, and general intangibles;

     (h)     All products of the Collateral and all additions and accessions to, replacements of, insurance or condemnation proceeds of, and documents covering Collateral, all property received wholly or partly in trade or exchange for Collateral, all leases of Collateral and all rents, revenues, issues, profits and proceeds arising from the sale, lease, encumbrance, collection, or any other temporary or permanent disposition, of the Collateral or any interest therein.

*Id.* at ¶ 44.

49.    Importantly, the First OSC/TRO also required the Debtor to file and serve any opposition and/or a written response to the First OSC/TRO by November 1, 2010. No opposition or response was ever filed. *Id.* at ¶ 45.

50.    The First OSC/TRO further provided that the Debtor, its shareholders, officers, employees, agents, servants and assigns, and all those acting in concert with them (including the Zeigers and CRL), are hereby temporarily restrained and enjoined until further Order of this Court from dissipating, disposing of or otherwise transferring the Collateral. *Id.* at ¶ 46.

51.    On November 8, 2010, the State Court, pursuant to the express, full consent of all parties including the Bank, the Debtor, CRL and the Zeigers, the Court entered that certain Order Extending the Temporary Restraints and Providing Other Relief (the "Second OSC/TRO"). *Id.* at ¶ 47. A copy of the Second OSC/TRO is attached to the Geiger Certification as Exhibit M.

52.    The Second OSC/TRO provides, in pertinent part:

Except that as stated below or by further order of the Court, all
provisions of the Entered TRO shall remain in full force and effect,
except that the record shall not be closed as of November 1, 2010
and shall remain open at the discretion of the court and until
further order of the Court; and

The restraints provided in the Entered TRO be and are hereby
continued and extended as to all Defendants in this matter, such
that all Defendants, as well as their respective shareholders,
officers, employees, agents, servants, successors, assigns and/or
legal representatives are restrained and enjoined until further Order
of this Court from dissipating, disposing of or otherwise
transferring their assets, the collateral and Collateral held by
Admiral Wine & Liquor Company and identified in the Verified
Complaint and/or Entered TRO other than in the ordinary course

(emphasis supplied).  *Id.* at ¶ 48.

53.    As stated plainly in the Second OSC/TRO, as quoted above, CRL and the Zeigers

were and remain expressly enjoined and restrained until further Order of the State Court from

dissipating, disposing of or otherwise transferring, among other things, their assets and/or the

Bank's Collateral other than in the ordinary course.  *Id.* at ¶ 49.

**C.    Admiral's Chapter 11 Filing**

54.    On November 12, 2010 (the "Petition Date"), slightly over an hour before the

scheduled hearing before the State Court relative to the Bank's Verified Complaint, the Debtor

filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Neither CRL nor

the Zeigers (either separately or individually) have filed for bankruptcy protection.

55.    The Debtor is operating its business and managing its properties as a debtor-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

56.    No trustee or examiner has been appointed in the Debtor's bankruptcy case.

57.    To date, no official or unofficial committees have been appointed or formed in the

Debtor's Chapter 11 case.

**D.    The Proposed DIP Financing and Use of the Bank's Cash Collateral**

*(a)    The Proposed DIP Financing*

58.    On the Petition Date, the Debtor filed the DIP Financing Motion [Docket No. 8], seeking, among other things, authorization on an interim and final basis to use the Bank's cash collateral (the "Cash Collateral"), grant alleged adequate protection to the Bank, obtain post-petition financing (the "DIP Financing") from insider Michael Zeiger, the Debtor's principal, and grant Michael Zeiger a security interest and lien on all assets of the Debtor pursuant to section 364(c)(3) of the Bankruptcy Code junior only to the allowed secured claim of the Bank and any other valid and perfected prepetition liens and security interests.

59.    The Debtor asserts in the DIP Financing Motion that it requires DIP Financing and the use of Cash Collateral to preserve and maintain its business and continue its operations during the pendency of this Chapter 11 proceeding so that it can "reorganize its operations and restructure its debt." *See* DIP Financing Motion, ¶ 15.  However, neither the Motion nor any of the other pleadings and documents filed to date by the Debtor provide any further information whatsoever regarding the Debtor's goals and objectives in Chapter 11.

60.    As set forth more fully in the DIP Financing Motion, the Debtor proposes to enter into the DIP Financing transaction for the provision of a post-petition loan from Michael Zeiger, individually, in the total amount of $500,000 in debtor-in-possession financing pursuant to a one-page "Term Sheet" by and between the Debtor and Michael Zeiger, individually, to be allegedly documented more fully at a later date.  Michael Zeiger signed the Term Sheet as the Debtor's president, secretary and sole equity holder, as borrower, and individually, as lender.  The maturity date of the proposed DIP Financing is listed as the effective date of confirmation of the Debtor's plan of reorganization.

61.    Other pertinent terms of the proposed DIP Financing include:

- The Debtor is seeking approval of $200,000 of DIP Financing pursuant to its application for interim relief (the "Interim DIP Order"), to be heard at the Debtor's "first day hearing" to be conducted on November 16, 2010;

- The Debtor proposes to provide Michael Zeiger, individually, with a security interest and lien on all of the Borrower's assets pursuant to section 364(c)(3) of the Bankruptcy Code, junior only to the allowed secured claim of the Bank and any other valid and perfected pre-petition lien and security interest;

- A $100,000 carve-out for the allowed fees and expenses of Debtor's proposed bankruptcy counsel, i.e., 20 percent of the proposed DIP Financing;

- Scheduling a hearing to consider final approval of the proposed DIP Financing (the "Final DIP Order").

62.    Notably, in the DIP Financing Motion, the Debtor states that the Term Sheet was negotiated "at arms' length by the Debtor and Zeiger and the proposed post-petition financing to be provided by Zeiger has been extended in good faith as that term is used in section 364(e) of the Bankruptcy Code." See DIP Financing Motion, ¶ 23. This despite the fact that (i) the Term Sheet appears to have been negotiated between "two parties" that are one and the same – Michael Zeiger, and (ii) Michael Zeiger, individually, will receive a junior secured position in the Debtor if the proposed DIP Financing is approved.

63.    As the source of Michael Zeiger's funding for the proposed DIP Financing has not been disclosed, the Bank presumes that the cash is an asset of Michael Zeiger.

     (b)    *The Proposed Use of the Bank's Cash Collateral and Proposed Adequate Protection*

64.    As part of the DIP Financing Motion, the Debtor has requested approval to use the Bank's cash collateral in accordance with a budget attached thereto (the "Budget"), subject to a variance of ten percent (10%) of the "net cash flow" line amounts set forth in the Budget. The Debtor also acknowledges that a debtor may not use cash collateral without the consent of the

secured party – and that the Bank did not and does not consent.  *See* DIP Financing Motion, ¶ 27.

65.     The Debtor proposes to provide the Bank with two forms of adequate protection pursuant to section 361 of the Bankruptcy Code:   (i) a replacement lien (the "Replacement Lien"), and (ii) as additional adequate protection, a second lien on the CRL Property, solely to the extent of any diminution in value of the prepetition assets subject to the security interests and liens of the Bank as of the Petition Date (the "CRL Property Second Lien").  The Bank already has an undisputed, first priority lien on the CRL Property, as set forth above.  *See* DIP Financing Motion, ¶ 30.

66.     According to the Debtor, authorizing the use of the Bank's cash collateral will preserve the Debtor's operation and "will maintain the value of Capital One's collateral" and that the proposed protections offered will "adequately protect Capital One's security interests."  *See* DIP Financing Motion, ¶ 31.

## **OBJECTION**

**A.    Pursuant to the Second OSC/TRO, Michael Zeiger is Specifically Prohibited From Dissipating, Disposing of, or Otherwise Transferring His Assets Without Further Order of the State Court, Therefore He Cannot Provide the Debtor with the Proposed DIP Financing**

67.     As specifically set forth in the Second OSC/TRO, as delineated above, Michael Zeiger, individually, is expressly enjoined and restrained until further order of the State Court from dissipating, disposing of or otherwise transferring, among other things, his assets and/or the Bank's Collateral other than in the ordinary course.

68.     Those restraints are unambiguous and remain in place to date as to Michael Zeiger, as he is a non-debtor – the automatic stay provisions of section 362(a) of the Bankruptcy Court do not apply to impair the Second OSC/TRO as to Michael Zeiger.

69.     Nevertheless, according to the DIP Financing Motion and the accompanying

Term Sheet, Michael Zeiger intends to provide the Debtor with $500,000 of his own cash as post-petition financing. While neither the Debtor nor Michael Zeiger disclose the source of cash for the $500,000, there is no indication that the source is anyone but Michael Zeiger. In no uncertain terms, <u>any</u> attempted provision of post-petition financing to the Debtor by Michael Zeiger, individually, is in direct violation of the Second OSC/TRO, as such transaction would clearly not be in the ordinary course.[4] In the context of the Debtor's Chapter 11 case, this Court must respect the Second OSC/TRO issued by the State Court and deny any attempts by non-debtor Michael Zeiger to dissipate and/or transfer his assets as he is in contravention of the Second OSC/TRO.

70.    It is axiomatic that any post-petition financing must be negotiated at arms' length and in good faith. In the DIP Financing Motion, the Debtor states that the Term Sheet was negotiated "at arms' length by the Debtor and Zeiger and the post-petition financing to be provided by Zeiger has been extended in good faith as that term is used in section 364(e) of the Bankruptcy Code." *See* DIP Financing Motion, ¶ 23. This assertion was made despite the fact that (i) the Term Sheet appears to have been negotiated between parties that are one and the same – Michael Zeiger, and (ii) Michael Zeiger, individually, will receive a junior secured position in the Debtor if the proposed DIP Financing is approved. "Negotiation" of  DIP financing agreement by an insider of the Debtor and himself individually cannot under any reasonable interpretation be considered a good faith, arms' length negotiation.

71.    For the above reasons (and those to be further presented by the Bank), the Bank respectfully requests that the Court deny the DIP Financing Motion in its entirety.

---

[4]    The Bank intends to pursue its  rights and remedies against Michael Zeiger and all other obligors (except the Debtor) in the State Court at this time.

**B.    The Debtor Has Failed to Demonstrate That the Proposed Adequate Protection is Sufficient**

72.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use, sell, or lease cash collateral unless: "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  The Bank does not consent to the Debtor's use of its Cash Collateral.  Therefore, under section 363(e) of the Bankruptcy Code, this Court must prohibit the use of the Bank's Cash Collateral unless the Debtor can demonstrate, and the Court approves, conditions that provide adequate protection of the Bank's interest in its Cash Collateral.  11 U.S.C. § 363(e).

73.    As the Third Circuit has recognized, the "[t]he whole purpose of adequate protection for a creditor to insure that the creditor receives the value for which [it] bargained pre-bankruptcy." *Resolution Trust Corp. v. Swedeland Dev. Group., Inc (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994).  "The concept of adequate protection finds its basis in the Fifth Amendment's protection of property interests." *In re DeSardi*, 340 B.R. 790, 797 (Bankr. S.D. Tex. 2006).  Simply put, the notion of adequate protection is grounded in the belief that secured creditors should not be deprived of the benefit of their bargain. *Id.*

74.    Under section 363(p)(1) of the Bankruptcy Code, the Debtor has the burden of proving the Bank's interest in its Cash Collateral is adequately protected.  11 U.S.C. § 363(c)(2).  Here, the Debtor seeks to use the Bank's Cash Collateral to continue to operate its business while its own projections provide for continuing cash losses – which is backed up by historical data demonstrating the Debtor's declining business enterprise, as discussed below.  Neither of the Debtor's proposed adequate protection proposals provides the Bank the value for which it bargained pre-bankruptcy.  Furthermore, in the case of the CRL Property Second Lien, such lien

is strictly prohibited from being granted as adequate protection without the Bank's consent (which it does not provide) due to the restraints placed on CRL by the State Court with the Second OSC/TRO. The Debtor is, therefore, unable to meet its burden in this case.

### (a)    Pursuant to the Second OSC/TRO, CRL is Expressly Prohibited from Further Encumbering the CRL Property

75.    As stated plainly in the Second OSC/TRO, CRL (and the Zeigers) is expressly enjoined and restrained until further order of the State Court from dissipating, disposing of or otherwise transferring, among other things, their assets and/or the Bank's Collateral other than in the ordinary course.

76.    Those restraints remain in place to date as to CRL (and the Zeigers), as CRL is a non-debtor not subject to the protections of section 362(a) of the Bankruptcy Code and the State Court has not issued a further order removing such restraints.

77.    Nevertheless, according to the DIP Financing Motion, as additional adequate protection to the Bank, the Debtor proposes to provide the Bank with the CRL Property Second Lien. Under the clear and unambiguous terms of the Second OSC/TRO, CRL is strictly prohibited from further encumbering the CRL Property. Therefore, neither the Debtor nor CRL may offer the CRL Property Second Lien as adequate protection without the Bank's consent, which it does not give (for the reasons discussed in the Cross-Motion below).

78.    Therefore, that aspect of the Debtor's proposed adequate protection of the Bank's interests in the Cash Collateral is wholly inadequate and in fact prohibited by a valid and enforceable order issued by the State Court.

### (b)    The Bank's Interest in its Cash Collateral is Not Adequately Protected by the Proposed Replacement Lien

79.    In addition to the proposed (and prohibited) CRL Property Second Lien, the DIP

Financing Motion proposes that the Bank's interest in Cash Collateral is adequately protected by the Replacement Lien.   While such a replacement lien may provide adequate protection in some cases, such as a case where the debtor is actually replacing the cash used with collateral of equal or greater value, a replacement lien does not constitute adequate protection in this case.

80.    It became clear in the Bank's lengthy and frustrating pre-bankruptcy history and negotiations that the Debtor and its principal, Michael Zeiger, were unable and/or unwilling to provide the kind of reliable financial information that is necessary for this Court to make a reasoned ruling as to whether the Bank's interest can be adequately protected.   Despite these obstacles, the Bank has been able to determine that the Debtor has incurred heavy recent losses, with the help of CRS (as defined below).   *See* Geiger Certification, ¶¶ 51-56.

81.    In short, the Debtor is dead in the water.   For nearly two years, the Debtor has had an opportunity to pay the Bank, locate new investors, and/or sell its business.   None of these things have occurred.   Additionally, the Debtor's own projections contained in the Budget (which the Bank believes are wholly unreliable in any event) show that it will incur significant cash losses, and that it will continue to burn the Bank's Cash Collateral with no end in sight. Allowing the Debtor to use the Bank's Cash Collateral places the Bank at a substantial risk while the Debtor seeks to engage in "business as usual."   The Bank's Cash Collateral cannot be used to engage in such a speculative venture.   The Debtor has already had an ample opportunity to "reorganize" pre-petition.   Respectfully, there is nothing to be done in this Chapter 11 case except to further delay resolution and exercise of the Bank's collection rights and remedies.

82.    In fact, the Debtor's arguments for use of cash collateral, while not detailed in its bare-bones DIP Financing Motion, appear similar to the argument rejected in *In re Swedeland Development Group, Inc.*, 16 F.3d 552 (3d Cir. 1994).   In *Swedeland*, the debtor was developing

a 508-acre golf course and residential project. It argued that the pre-petition lender was adequately protected by the increased value of the property that would result from continued construction on the project. The Third Circuit rejected this contention. The Court emphasized that, "[i]n the first place, continued construction based on projections and improvements to the property does not alone constitute adequate protection." *Id.* at 566 (citing *Town of Westport v. Inn at Longshore*, 32 B.R. 942, 946 (Bankr. D. Conn. 1983)). The court distinguished cases holding that improving existing collateral was adequate protection by noting that "those cases . . . have done so only when the improvements were made in conjunction with the debtor's providing additional collateral beyond the contemplated improvements." *Id.* (citing cases). The court rejected "the notion that development property is increased in value simply because a debtor may continue with construction which might or might not prove to be profitable." *Id.* In the most generous interpretation, this is effectively the argument that the Debtor makes in support of its use of the Bank's cash collateral and, like the Third Circuit, this Court should reject it.

83.    Also, the fact that Debtor has historically lost money year after year and has presented a budget that follows form makes the Debtor's concept of adequate protection too speculative to pass muster under *Swedeland.* For example, in *Sharon Steel Corp. v. Citibank, N.A.*, 159 B.R. 165 (Bankr. W.D. Pa. 1993), the court denied use of cash collateral of two secured creditors due to the losses that the debtor had projected, even though the creditors were over-secured. The court noted that the debtor's business plan contemplated losses over the first four months and a profit thereafter based in part on the sale of its coke ovens that would provide additional cash. Finding the business plan unrealistic and unattainable, the court concluded that the losses suffered by the debtor would unfairly impact the lender's interests. The court reasoned that the debtor's business plan was "unduly optimistic" because "[w]ithout new capital to permit

this debtor to make needed capital expenditures to make it competitive and to provide working capital, the debtor will again be unable to sustain operations within a short time. Losses can quickly mount. . . ." *Id*. at 172.

84.    The same analysis applies to the Debtor and the use of cash collateral should be denied.  The Debtor seeks to place the Bank's cash collateral at risk on a business plan that has lost money from its inception and will do so – or at best break even - for the foreseeable future, even according to the Debtor's own projections contained in the Budget.

85.    This Court cannot find that the Bank's interests are adequately protected based upon the mere recitation by the Debtor that they will be adequately protected by a replacement lien on post-petition assets.  *In re Stony Creek Technologies, LLC,* 364 B.R. 882, 890 n.25 (Bankr. E.D. Pa. 2007) (noting that the Third Circuit in *Swedeland* "admonished bankruptcy judges in this circuit to require a tangible demonstration of adequate protection").  To satisfy its burden of proving adequate protection through replacement liens, a debtor must provide that the value of the replacement lien is greater than or equal to the difference between the value of the creditor's liens on the debtor's property and the value of the liens after the use of the collateral. *See, In re Reading Tube Indus.,* 72 B.R. 329, 333 (denying debtor's motion to borrow funds for lack of adequate protection to the prime creditor, where debtor did not present sufficient evidence as to the value of replacement liens and relied solely on its personal projection to demonstrate the existence of adequate protection).  It has not done so here.  Not a shred of evidence has been adduced by the Debtor regarding valuation that could give the Bank comfort that the Replacement Lien might be sufficient.  Therefore, the DIP Financing Motion should be denied in its entirety.

### (c)    The Debtor And Michael Zeiger Have Consistently Provided Inaccurate and Misleading Information To the Bank

86.    The speculation and riskiness that undermine the adequacy of the protection of the Bank's Cash Collateral are especially noteworthy here because of the Debtor's history of providing inaccurate, incomplete and insufficient information to the Bank. *In re Certified Corp.*, 51 B.R. 768, 772 (Bankr. D. Haw. 1985) (based on evidence of possible dishonesty, mismanagement and fraud, the court questioned the value of collateral and utilized flexibility permitted by section 361(3) to fashion and grant relief as would result in the realization of the creditor's indubitable equivalent of its interest in its cash collateral).

87.    Pursuant to the March Forbearance Agreement, Admiral, CRL and the Zeigers agreed that the Bank could have the Collateral inspected by Cost Recovery Systems of Parsippany, New Jersey ("CRS"). *See* Geiger Certification, ¶ 50.

88.    Subsequent to the March Forbearance Agreement, CRS inspected the operations of Admiral. *Id.* at ¶ 51. As set forth in Exhibit N to the Geiger Certification, which is the Certification of Michael Albanese of CRS, submitted in support of the State Court Complaint in the State Court Action, CRS concluded that:

> a.    Net sales at Admiral have decreased. For the 12 months ending August 31, 2010, sales decreased by 2.4%, or $419,00.00. However, for the 3 month period ending August 31, 2010, compared to the same three months period in 2009, sales decreased by 19.6%, or $808,000.00.

> b.    Admirals' accounting records were reported to me by management to be in disarray. Per management, due to a conversion from one computer system to another, and errors in that process, Admiral cannot provide reliable statistical information on account receivables after June 30, 2010. Management was unable to provide an accounts receivable aging for July 31, 2010, and August 31, 2010, such that the reliability of any numbers for accounts receivables through August 31 2010, must be questioned.

c.     The reports provided by management indicate that accounts receivables are down by 33% from just February, 2010, a decrease of $775,000.00.  Given the circumstances, and the asserted inability of Admiral to provide up to date receivables information, I believe that it is likely that the decline in receivables is greater then 33%.

d.     We performed our own tests on the books and records of Admiral.  This included inspection of the paper work for randomly selected transactions, and comparison to the books and records.  After inspection and standard exam tests and processes, CRS deemed the books and records of Admiral to be in poor condition.

e.     Admiral's inventory records indicates that its inventory has shrunk significantly from this time a year ago.  Inventory is down by nearly 20% from March 2010, and continues to decline.

f.     Operating losses continue and are funded by accounts receivable collections.  The deteriorating liquidity of Admiral Wine is having a negative impact on sales volume.

g.     Bank reconciliations of the operating account have not been completed since December 2009.

89.    The foregoing establishes that Admiral has failed to maintain proper books and records as required under the terms of the Admiral Loan Documents, will be unable to promulgate true and accurate schedules and statements in the Chapter 11 case, and has engaged in a pattern of mismanagement that must be considered in connection with any determination of the Bank's adequate protection.  Moreover, the Debtor has failed to include any valuation data in any of its filing that could help enable the Bank to determine the sufficiency of the proposed adequate protection.

90.    Additionally, Michael Zeiger recently informed the Bank directly that the financial statement he had the Bank is <u>not</u> accurate.  *See* Geiger Certification, ¶ 52.

91.    Finally, as of November 15, 2010, the Debtor's operating account was overdrawn today by $10,839.00.  According to the Budget submitted in support of the DIP Financing

Motion, the Debtor appears to have sufficient cash in its operating account to enable it not to be overdrawn. *Id.* at ¶ 54.

92.    These facts demonstrate that the Debtor has failed to maintain proper books and records as required under the terms of the Admiral Loan Documents, will be unable to promulgate true and accurate schedules and statements in the Chapter 11 case, and that the proposed post-petition Budget provided by the Debtor is unreliable at best.

**WHEREFORE**, the Bank respectfully requests that the Court enter an order: (i) denying the DIP Financing Motion in its entirety; and (ii) granting such other relief as the Court deems appropriate.

## CROSS-MOTION

93.    By this Cross-Motion, brought before the Court on an emergency basis, the Bank seeks entry of an order, pursuant to sections 105(a) and 1112(b) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 1017(a), dismissing the Debtor's Chapter 11 case.

## BASIS FOR RELIEF REQUESTED

94.    Section 1112(b) of the Bankruptcy Code provides, in relevant part, that "on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of the creditors and the estate, the court shall convert a case under [chapter 11] to a case under chapter 7 or dismiss a case under [chapter 11]...if the movant establishes Cause." 11 U.S.C. § 1112(b)(1).

95.    Section 1112(b)(4) of the Bankruptcy Code enumerates a non-exclusive list of items that constitute "cause," including, *inter alia*, substantial or continuing loss to or diminution of the estate, absence of a reasonable likelihood of rehabilitation, gross mismanagement of the

estate, failure to timely provide information or attend meetings, and failure to timely file a

disclosure statement, or file or confirm a plan of reorganization.  11 U.S.C. § 1112(b)(4).

96.    "[I]t is well established that the listed factors are not exclusive."  *In re Hampton*

*Hotel Investors, L.P.*, 270 B.R. 346, 358 (Bankr. S.D.N.Y. 2001).  Therefore, the court "will be

able to consider other factors than those enumerated in § 1112(b) as they arise, and to use its

equitable powers to reach an appropriate result in individual cases."  *Id.* (internal quotations

omitted).  As one court noted:

> [t]he precise parameters of 'cause' are intentionally omitted
> from the statute so as to afford maximum flexibility and, among
> other things, to enable a bankruptcy court to dismiss a Chapter
> 11 case for any reason cognizable to the equity power and
> conscience of the court as constituting an abuse of the bankruptcy
> reorganization process.

*Id.* (quoting *In re HBA East, Inc.*, 87 B.R. 248, 258 (Bankr. E.D.N.Y. 1988)).

**A.    Cause Exists To Dismiss The Debtor's Chapter 11 Case When It Was Not Filed In
Good Faith Or In Furtherance Of A Rehabilitative Purpose**

97.    To prevent abuse of the protections of chapter 11, courts have imposed a requirement

that the petition be filed in good faith.  *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994). "The

purpose of the good faith requirement is to ensure that the hardships imposed on creditors are

justified by fulfillment of statutory objectives." *In re Liberate Technologies*, 314 B.R. 206, 211

(Bankr. N.D. Cal. 2004) (dismissing chapter 11 case upon creditor's motion because, although

the Debtors' business was unsuccessful, it had cash that exceeded its liabilities and did not need

bankruptcy protection).

98.    The good faith requirement operates through section 1112(b), and is "a species of

cause for dismissal." *Id.*; *see also Fraternal Composite Services, Inc. v. Karczewski*, 315 B.R.

253, 256 (N.D.N.Y. 2004). Whether a petition fails to satisfy the good faith requirement, so as to warrant its dismissal, requires "careful examination of the facts on a case by-case basis." *In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997). Grounds for dismissal exist if it is clear on the filing date that "there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from the bankruptcy proceedings." *In re C-TC 9th Ave. Partnership*, 113, F.3d 1304, 1309 (2d Cir. 1997) (internal quotations omitted). "[A] determination of bad faith requires a full examination of all the circumstances of the case," and a court may draw inferences from the record to dismiss a chapter 11 case. *Id.* at 1312.

99.     In this case, there is no clear and documented intent to reorganize the Debtors or for it to emerge from bankruptcy – a fact known from day-one based upon the Debtor's failure to file a first day affidavit explaining its goals and objectives in Chapter 11 and ignoring the subject in any of its pleadings to date. This Chapter 11 filing was initiated for the <u>sole purpose</u> of staying the November 12, 2010 State Court hearing and the Bank's Verified Complaint, to which the Debtor admitted on many occasions that it has no defense. The sole purpose of this case is to delay the inevitable, and that is the liquidation of the Debtor and the Bank enforcing all of its collection rights and remedies

100.     Accordingly, the Debtor's Chapter 11 petition does not embody "any relation to the statutory objective of resuscitating a financially troubled debtor." *Carolin Corp. v. Miller*, 886 F.2d 693, 701 (4th Cir. 1989).

**B.     The Debtor is Not Acting In Accordance With Its Fiduciary Duties to its Estate and Stakeholders, Warranting Dismissal of its Chapter 11 Case**

101.     The Debtor owes duties to its estate and its stakeholders to maximize value.

Its actions in these cases are not consistent with or in furtherance of these duties.[5]  *See, e.g.,
Cenargo International, PLC*, 294 B.R. 571, 599 n. 32 (Bankr. S.D.N.Y. 2003) ("There is no
question that a debtor in possession is a fiduciary, like a chapter 11 trustee, for the estate,
creditors and shareholders") (citing *CFTC v. Weintraub*, 471 U.S. 343, 355 (1985); *In re
Bidermann Indus., U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997)); *Louisiana World
Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 246 (5th Cir. 1988) (noting that debtor in possession is
"duty bound to [act] if doing so would maximize the value of the estate") (citation omitted); *In re
Texasoil Enters., Inc.*, 296 B.R. 431, 435 (Bankr. N.D. Tex. 2003) (debtor in possession is
"charged with the duties of a fiduciary, holding the estate and operating the business for the benefit
of . . . creditors and equity owners").

102.    The willingness of courts to leave debtors in possession "is premised upon an
assurance that the officers and managing employees can be depended upon to carry out the
fiduciary responsibilities of a trustee." *CFTC*, 471 U.S. at 355.  As such, stakeholders have the
right to require the debtor in possession's management to exercise its powers for their benefit,
and the benefit of the estate as a whole.  *See In re Penick Pharmaceutical, Inc.*, 227 B.R. 229,
232-33 (Bankr. S.D.N.Y. 1998) ("[I]n the case of an inanimate debtor in possession such as a
corporation, the fiduciary duties borne by a trustee for a debtor out of possession fall on the
debtor's directors, officers and managing employees ... who have a duty to maximize the value

---

[5]        These duties of a debtor in possession are specifically delineated in the Bankruptcy Code.  Section
1107 provides that a debtor in possession has the same duties to the estate and creditors as those of a chapter 11
trustee. 11 U.S.C. § 1107(a).  Section 1 106(a)(1) of the Bankruptcy Code requires a chapter 11 trustee (and by
virtue of section 1107(a), a debtor in possession as well), to fulfill certain of the duties contained in Bankruptcy
Code section 704. *See* 11 U.S.C. § 11 06(a)(1) (stating that a trustee "shall perform the duties of a trustee
specified in sections 704(2), 704(5), 704(7), 704(8) and 704(9) of this title.").  Bankruptcy Code section 704(2)
requires a trustee, and therefore, a debtor in possession, to "be accountable for all property received, 11 U.S.C. §
704(2), and to "carefully preserve the estate's assets from deterioration or dissipation." 6 Collier on Bankruptcy ¶
704.04[2] (15th Ed. Rev. 2010).

of the estate ... and who are burdened to ensure that the resources that flow through the debtor in

possession's hands are used to benefit the unsecured creditors and other parties in interest.")

(citations omitted).

103.    The Bankruptcy Code requires debtors in possession to have undivided loyalty to

the estate and its stakeholders, as "[e]quity tolerates in bankruptcy trustees no interest adverse to

the trust." *Mosser v. Darrow*, 341 U.S. 267, 271 (1951).  Thus, when acting on behalf of two

separate but affiliated debtor estates, management must observe the distinct fiduciary duties

that are owed to each estate. *See In re N.S. Garrott & Sons*, 63 B.R. 189, 191 (Bankr. E.D. Ark.

1986) (noting that when a fiduciary of two jointly administered estates chooses to favor the rights

of one estate's creditors over the other's, that fiduciary holds an adverse interest in relation to

the first estate); *In re Herberman*, 122 B.R. 273, 28 1-82 (Bankr. W.D. Tex. 1990) (stating that

"the higher duty of the debtor as trustee/fiduciary must take precedence over the more self-

interested concerns of the debtor").

104.    While a debtor in possession does have latitude to exercise its business judgment in

deciding whether to take actions affecting the estate, the freedom from oversight will be

constrained where management has conflicting interests that lead to actions or decisions falling

outside the scope of good business judgment.  *See, e.g.*, *Mission Iowa Wind Co. v. Enron Corp.*,

291 B.R. 39, 43 (S.D.N.Y. 2003) (holding that bankruptcy court should not "defer in conclusory

fashion to the debtors' business judgment" and must have regard for "the duty of bankruptcy

courts to preserve the integrity of separate estates").

105.    Courts have found section 1112(b) "cause" based on breaches of a debtor in

possession's fiduciary duty to the estate and its stakeholders. *See, e.g.*, *Hampton Hotel

Investors*, 270 B.R. at 358 (court's lack of confidence in the debtor in possession's ability and

inclination to comply with its fiduciary duties constituted "cause" under section 1112(b)); *In re Federal Roofing Co., Inc.*, 205 B.R. 638, 642-43 (Bankr. N.D. Ala. 1996) (citing debtor in possession's breach of fiduciary duty to the estate – maintaining an ongoing financial transaction with an insider – as a ground for dismissal or conversion).

106.    In filing its Chapter 11 petition with the express and sole intent of preventing the Bank from repossessing its Collateral through the State Court Action –to which the Debtor has admitted on numerous occasions that it has no defense - the Debtor has exhibited patently bad business judgment.  Rather, the decision reflects the decision of the conflicted director – i.e., Michael Zeiger, who is both the principal of the Debtor and the proposed DIP lender, to ignore his fiduciary duties to the Debtor's stakeholders by filing a bankruptcy petition and supporting pleadings without any indication whatsoever of why the Debtor is in bankruptcy to begin with, or offering any hope of reorganization or rehabilitation.

107.    The two-plus years since the Bank commenced its involvement with the Debtor have been filled with nothing but misrepresentations, broken promises and subterfuge on the part of the Debtor.  In point of fact, in the period since the Bank's involvement, despite endless promises to the contrary, the Debtor has failed to present to the Bank: (i) any offer or letter of intent of a potential purchaser to buy or transfer the Debtor's business, (ii) any offer or proposal to re-finance the Debtor's undisputed obligations to the Bank, (iii) any business plan regarding the viability of the Debtor on a going-forward basis, and/or (iv) any viable plan or exit strategy for the Debtor either through Chapter 11 or otherwise.  And now the Debtor has filed its Chapter 11 petition and at least 8 "first day" motions and applications and other supporting papers none of which contain <u>any information whatsoever</u> regarding the Debtor's plans and objectives in Chapter 11, how it

intends to reorganize, if at all, or how being in Chapter 11 will benefit the Debtor's creditors.

108.    In fact, every one of the "first day" motions contains only one cryptic sentence, intended to sum up the Debtor's Chapter 11 intentions and provide creditors and the Court with information regarding the Debtor's business plan:  "The Debtor intends to utilize the chapter 11 process to reorganize its operations and restructure its debt," but each utterly fail to provide any further explanation.  On that basis alone, the Debtor requests that the Court grant numerous applications for first day relief including approving a DIP loan from a non-debtor insider that is clearly prohibited by a State Court order, and the provision of certain adequate protection from the Bank that is also prohibited from being given under that same State Court order

109.    Moreover, CRS' investigation as described above, as well as the certain investigation undertaken by the Bank, establishes that the Debtor has failed to maintain proper books and records as required under the terms of the Admiral Loan Documents, will be unable to promulgate true and accurate schedules and statements in the Chapter 11.  *See* Geiger Certification, ¶¶ 50-55.

110.    In short, the Debtor's Chapter 11 is a sham and nothing more.  Every minute more that this case remains in bankruptcy further jeopardizes the Bank's Collateral as well as reduces all other creditors' already-slim chances for any recovery from this estate. Therefore, the Bank respectfully requests that this Court immediately dismiss the Debtor's Chapter 11 case.

**C.    It is in it's Creditors' and Estate's Best Interests That the Debtor's Chapter 11 Case Be Dismissed Rather Than Converted to a Chapter 7 Liquidation**

111.    The Bankruptcy Code requires the court to determine whether conversion or

dismissal is in the best interest of the creditors and the estate. *In re The V Companies*, 274 B.R. 721, 740 (Bankr. N.D. Ohio 2002). However, the Bankruptcy Code does not define the "best interests of creditors and the estate." Therefore, "courts are required to consider and weigh the totality of the facts and circumstances of the individual case when determining what is in the best interests of creditors." *In re Hampton Hotel Investors*, 270 B.R. at 358. This entails comparing the creditors' rights in a chapter 7 liquidation and the rights they would have under non-bankruptcy law upon dismissal. *In re V Companies*, 274 B.R. at 740.

112.    As discussed above, the Debtor is not in need of rehabilitation or reorganization. The Debtor does not belong in bankruptcy, whether pursuant to Chapter 7 or Chapter 11. There is no need for liquidation in bankruptcy, nor would the Debtor's creditors benefit from liquidation. In fact, conversion to Chapter 7 would inevitably only serve the purpose of creating additional administrative cots. Instead, dismissal of the Debtor's case is in the best interests of its creditors – both secured and unsecured - and estate.

**D.    In the Alternative, this Court Should Abstain from Hearing the Debtor's Chapter 11 Case**

113.    After notice and a hearing, the Court may suspend all proceedings in a case under Title 11 at any time if "the interests of creditors and the debtor would be better served by such dismissal or suspension. 11 U.S.C. § 305(a)(1).

114.    In considering relief under section 305(a) of the Bankruptcy Code, courts have "considered a wide range of factors, including but not limited to", "the availability of another forum to achieve a just and equitable resolution, the economy and efficiency of having the bankruptcy court handle the matter, the possible prejudice to various parties," whether "the bankruptcy court is being used as a forum to resolve what is essentially a two-party dispute", and whether the issues in dispute are non-bankruptcy issues. *Steinman v. Spencer (In re Argus*

*Group 1700, Inc.)*, 206 B.R. 737, 755 (E.D. Pa. 1996) (quoting *In re Carl Mazzocone*, 200 B.R.

568, 575 (E.D. Pa. 1996) and *In re Mazzocone*, 183 B.R. 402, 421 (Bankr. E.D. Pa. 1995); *Santa

Fe Materials, Inc. v. BEPCO, LP (In re 15375 Memorial Corporation)*, 382 B.R. 652, 686

(Bankr. D. Del 2008) (quoting *In re Carl Mazzocone*, 200 B.R. at 575).

115.    In the event that the Court elects not to dismiss the Debtor's petition as requested

above, abstention under section 305(a) of the Bankruptcy Code in this Chapter 11 cases would

promotes the interests of both the Debtor and its creditors, including the Bank.  The Bank would

have its full rights to seek all available remedies against the Debtor in the non-bankruptcy courts

which has jurisdiction over the matter.  In addition, the Bank has not exhausted its efforts to

reach a negotiated resolution of the issues with the Debtor.  As set forth herein, continuing in

Chapter 11 will both delay the eventual resolution of the Bank's claim against the Debtor and

will result in significant administrative time and expense to the Debtor.

116.    Finally, the issues that govern the dispute between the Bank and the Debtor are

exclusively non-bankruptcy issues.   The jurisdiction of this Court should not be imposed where

there is a classic two-party dispute involving solely state law issues.  *See In re Argus Group

1700*, 206 B.R. at 755.

117.    As the Court is no doubt aware, there is no one factor that is determinative in the

Court's decision to abstain or not.  What is relevant is whether abstention and dismissal of this

Case is in the best interest of the creditors and the Debtor.  *See In re NRG Energy, Inc.*, 394 B.R.

at 81.  In this case, it is indisputably in the best interests of this Debtor and its creditors.

## <u>RESERVATION OF RIGHTS</u>

118.    Given the interim nature of the relief sought by the Debtor in the DIP Financing

Motion, and the extremely limited time that the Bank was given to respond to the myriad first-

day motions, the Bank reserves any and all arguments, positions, rights and remedies and the like

it may possess and to supplement, modify or otherwise revise the Objection, the Cross-Motion,

as well as any other pleadings filed prior to the scheduled November 16, 2010 first day hearing

and thereafter.  In addition, the Bank reserves the right to interpose any appropriate objection(s)

to any application by the Debtor for final DIP Financing and/or other relief, if applicable.

### NOTICE, PRIOR REQUEST AND WAIVER OF MEMORNDUM OF LAW

119.    Notice of this Objection and Cross-Motion have been given to (i) the Office of

the United States Trustee for the District of New Jersey, (ii) counsel to the Debtor, and (iii) all

parties that have filed a request for notices in this Chapter 11 case.  In light of the nature of the

relief requested herein, the Bank submits that no other or further notice is required.

120.    No other or prior request for relief sought herein has been made to this or to any

other court.

121.    As no novel issue of law is raised and the relevant authorities relied upon by the

Bank are set forth herein, the Bank respectfully requests that the requirement under D.N.J.

LBR 9013-2 of the filing of a memorandum of law be waived (as to both the Objection and the

Cross-Motion).

**WHEREFORE**, the Bank respectfully requests that the Court enter an order: (i) granting

the Cross-Motion in its entirety; (ii) dismissing the Debtor's Chapter 11 cases with prejudice;

and (iii) granting such other relief as the Court deems appropriate.

Dated:  November 15, 2010

Respectfully submitted,

**LeClairRyan,**
A Professional Corporation

By:   */s/ Todd M. Galante*

Todd M. Galante (TG-5532)
Jason C. DiBattista (JD-2859)
One Riverfront Plaza, Sixteenth Floor
1037 Raymond Boulevard
Newark, New Jersey 07102
Telephone:  (973) 491-3600
Facsimile:  (973) 491-3555

*Counsel for Capital One, N.A.*